UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 6:26-cr-00189- CEM-RMN
18 U.S.C. § 1343
(Wire Fraud)

MICHAEL SARACCO

## INFORMATION

The United States Attorney charges:

### COUNTS ONE THROUGH THREE
(Wire Fraud - 18 U.S.C. § 1343)

#### A.     Introduction

At all times material to this Information:

1.     Michael Saracco ("SARACCO"), was a resident of the Middle District of Florida and was at times, a licensed attorney who practiced law at Saracco Law.

2.     Driftwood Title, LLC ("Driftwood"), was a title company organized and controlled by SARACCO, that conducted real estate settlement services and issued title insurance policies to mortgage lenders and borrowers. SARACCO opened and controlled multiple Driftwood-maintained operating and escrow accounts at various banks including accounts at JP Morgan Chase Bank ("JPMC") ending x8697, x7958, and x7365. JPMC's servers were located outside of Florida. Driftwood also maintained an escrow account ending in x8029 at Bank United, with servers located outside of Florida.

3.      In a typical residential real estate transaction, a borrower obtained a mortgage loan from a lender to purchase a piece of real estate, or to refinance an existing loan. A title company conducted a title search to verify that the seller had title to the property and prepared the necessary paperwork to "close" the loan. When the loan was ready for closing, the lender transmitted the necessary funds to the title company, usually by means of an interstate bank-to-bank wire transfer. The funds, together with the amount tendered by the buyer or the property owner to cover the downpayment and closing costs, were then disbursed by the title company according to the closing instructions it received. The title company was responsible for, among other things, paying off the seller's mortgage loan or in a refinancing the homeowners previous lender, which then released its lien against the property, paying off any other outstanding liens against the property, paying the seller for his or her equity in the property, paying any property taxes, and paying the necessary fees to record the deed on the property with the County Registrar or Recorder of Deeds.

4.      Title Underwriter 1 and Title Underwriter 2 were both title insurance underwriters in the business of issuing title insurance policies that insured property owners and lenders against potential losses resulting from claims challenging the legal validity of their ownership interests in real estate. Under these policies, these title insurance underwriters agreed to pay off any losses suffered by lenders or owners as a result of mistakes made by the title company in verifying the subject property's chain of title, recording the deed on the property, or disbursing the lenders funds to proper persons or entities.  Title Underwriter 1 and Title Underwriter 2 entered into agency

2

agreements with Driftwood that authorized Driftwood to sell their title insurance policies to lenders and buyers as part of the services they provided as the settlement agent.

5.     Like all title companies which are regulated and licensed by the State of Florida, Driftwood was required by its agency agreements to deposit the funds it received from the lenders, buyers and homeowners into an escrow account in order to segregate these monies from its own funds. Driftwood was also legally required to disburse the lender's funds in the manner specified by the mortgage lender as reflected on the ALTA Settlement Statement, a standardized form developed by the American Land Title Association that itemized all of the fees and charges associated with a real estate transaction, providing a detailed breakdown of credits and debits for both the buyer and seller.

6.     Title companies were also legally required to notify property buyers, sellers, and lenders of any existing liens or mortgages on the subject property. Additionally, title companies were required to pay off any existing liens or mortgages at the time the real estate settlement was conducted.

7.     All Florida Property Solutions, LLC ("AFPS"), was a real estate investment company owned and controlled by SARACCO headquartered in the Middle District of Florida. SARACCO opened and controlled AFPS bank accounts at multiple banks located in the Middle District of Florida, including a JPMC account ending in x8800.

3

8. Private Lending Company 1 was a privately owned lending company that provided short-term financing to real estate investors, including AFPS.

9. Private Lending Company 2 was a privately owned lending company that provided short-term financing to real estate investors, including AFPS. Private Lending Company 2 held a bank account at Truist Bank ending in x7755. Truist Bank's servers were located outside of Florida.

10. Mortgage Company 1 was a financial institution as defined by the Fraud Enforcement and Recovery Act of 2009, that is, an organization that financed and refinanced debt secured by an interest in real estate and with activities that affected interstate and foreign commerce. Mortgage Company 1 maintained a funding account at Centier Bank ending in x1045. Centier Bank's servers were located outside Florida.

11. Mortgage Company 2 was a financial institution as defined by the Fraud Enforcement and Recovery Act of 2009, that is, an organization that financed and refinanced debt secured by an interest in real estate and with activities that affected interstate and foreign commerce. Mortgage Company 2 maintained a funding account at Bank of America ("BoA") ending in x0765. BoA's servers were located outside Florida.

12. It was the practice of many lending institutions, including Mortgage Company 1 and Mortgage Company 2, to make loans secured by real property to borrowers to fund their purchase of real property. Such loans were often simply called mortgages or mortgage loans.

4

13. In determining whether to extend any such loan, it was also the practice of the lending institutions to rely upon the information contained in a borrowers' mortgage-related documents, such as Form 1003, Uniform Residential Loan Application (referred to herein as the "loan application"), the Closing Disclosure, and the mortgage itself.

14. The loan application was universally used by mortgage lenders in the mortgage loan approval process. The loan application required the borrower to truthfully provide the mortgage lender with various types of information, including the borrower's employment, outstanding debt, gross monthly income, source of closing costs and down payment, intended use of the property (such as investment or secondary residence), and the specific details of the anticipated real estate transaction.

15. When the mortgage lender received the loan application, it typically triggered what was known in the mortgage industry as the underwriting process. Essentially, the purpose of the underwriting process was to determine the ability of the borrower to repay the mortgage loan being requested. During the underwriting process, the mortgage lender considered a variety of factors in determining whether to issue a mortgage loan, including whether the property was encumbered, sources of income, assets, and liabilities.

16. The term title search referred to the examination of public records to determine and confirm a property's legal ownership. Title searches were conducted through many sources, including deeds, tax liens, land records, and court judgments, among others. Normally conducted by title companies, searches were ordered by

5

financial institutions, individuals, and businesses at any time to find out what, if any, claims or liens were on the property in question.

17.     The refinance of real property secured by a mortgage loan was finalized at a settlement conference, commonly known as a "closing", and usually presided over by a closing agent, such as Driftwood.   Typically, the closing agent worked for a title agent that was responsible for preparing closing documents, conducting real estate closings, and receiving and disbursing mortgage loan proceeds in accordance with the Closing Disclosure.

18.     A Closing Disclosure was a form used in the closing process to identify and allocate the various receipts, disbursements, expenses, and payments associated with the sale of residential real property between the buyer and the seller of the property.

### B.     Scheme and Artifice

19.     Beginning on an unknown date, but no later than in or around August 2019, and continuing through in or around July 2025, in the Middle District of Florida, and elsewhere, the defendant,

MICHAEL SARACCO,

did knowingly, willfully, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises that related to material facts, which scheme and artifice is described as follows:

## C.    <u>Manner and Means</u>

20.    The substance of the scheme and artifice, and the manner and means used to accomplish its ends, included, among other things, the following:

a.    It was a part of the scheme and artifice that the defendant would and did solicit Private Lending Company 1, Private Lending Company 2, and other private lenders for loans.

b.    It was further part of the scheme and artifice that the defendant would and did falsely represent to Private Lending Company 1, Private Lending Company 2, and other private lenders that the properties were not encumbered; that is, that no other loans were secured by the properties for which he was soliciting funds.

c.    It was further part of the scheme and artifice that the defendant would and did conduct real estate closings for the loan transactions and would and did represent to the lenders that he would, through his title company Driftwood, record the corresponding mortgage documents at the appropriate county clerk's office, when in truth and fact as the defendant then well knew, Driftwood would and did fail to record certain of the mortgages granted by private lenders or recorded the mortgages months after the closings.

d.    It was further part of the scheme and artifice that the defendant would and did seek subsequent loans from private lenders without disclosing the existence of the pre-existing private lender mortgages on his properties on the real estate settlement statements.

e.    It was further part of the scheme and artifice that the defendant would and did conduct the real estate closings for the subsequent private lender loans and would and did again represent to the lenders that he would, through his title company Driftwood, record the corresponding mortgage documents in the appropriate county clerk's office, when in truth and fact as the defendant then well knew, Driftwood would and did fail to record certain of the mortgages granted by private lenders.

f.    It was further part of the scheme and artifice that the defendant would and did make some initial mortgage payments to the private lenders but would and did eventually stop making payments, causing the private lenders to file foreclosure actions.

g.    It was further part of the scheme and artifice that the defendant would and did arrange for and carry out the sale of properties to related and unrelated third parties, which generated hundreds of thousands of dollars in seller proceeds. It was further part of the scheme and artifice that the defendant would not and did not pay off the existing mortgages with the private lenders, nor would he or did he notify them that the properties securing the private loans had been sold.

h.    It was further part of the scheme and artifice that the defendant would and did control the real estate settlements through Driftwood.

i.    It was further part of the scheme and artifice that the defendant would and did fail to disclose the existing private lender liens on the closing disclosure submitted to the financial institutions.

j.    It was further part of the scheme and artifice that the defendant would and did, on occasion, list the existing private lender encumbrances on closing disclosures and certify to the financial institutions that a portion of the mortgage proceeds would be used to pay off the private lender mortgages.

k.    It was further part of the scheme and artifice that the defendant through Driftwood would and did fail to pay off the private lender mortgages as promised and would and did divert the payoff proceeds to himself through AFPS.

l.    It was further part of the scheme and artifice that the defendant as part of the real estate closing would and did issue Title Commitment Letters along with Closing Protection Letters falsely representing that Driftwood would issue title insurance policies insured by Title Underwriter 1, Title Underwriter 2, and others.

m.    It was further part of the scheme and artifice that the defendant through Driftwood would and did collect title insurance premiums from the private lenders and financial institutions without obtaining the promised title insurance policies issued by the title underwriters.

n.    It was further part of the scheme and artifice that the defendant would and did perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purpose of the scheme and the acts committed in furtherance thereof.

### D.    Executions of the Scheme and Artifice

21.    On or about dates sent forth below, in the Middle District of Florida, and elsewhere, the defendant

MICHAEL A. SARACCO,

for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly, willfully, and with intent to defraud, transmit and cause to be transmitted, by means of wire, radio, and television communication in interstate and foreign commerce, the following writings, signs, signals, pictures, and sounds:

| Count | Date | Amount | Interstate Wire |
|---|---|---|---|
| One | 4-11-2023 | $230,000.00 | Electronic funds transfer from Private Lender 2's account ending in x7755 at Truist Bank to Driftwood's JPMC account ending in x8697 to fund a loan to AFPS, secured by a mortgage on a property located at 8xx Kara Circle, Rockledge FL. |
| Two | 5-23-2023 | $347,288.03 | Electronic funds transfer from Mortgage Lender 1's account ending in x1045 at Centier Bank to Driftwood's account ending in x8697 at JPMC to finance the purchase of a property, secured by a mortgage located at 8xx Kara Circle, Rockledge FL. |
| Three | 12-15-2023 | $430,455.79 | Electronic funds transfer from Mortgage Lender 2's account ending in x0765 at BoA to Driftwood's account ending in x8029 to finance SARACCO's purchase of 8xx Kara Circle, Rockledge FL. |

All in violation of 18 U.S.C § 1343.

10

## FORFEITURE

1.     The allegations contained in Counts One through Three are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.     Upon conviction of a violation of 18 U.S.C. § 1343, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violations.

3.     The property to be forfeited includes, but is not limited to, the following: an order of forfeiture in the amount of $1,007,743.82, which represents the proceeds the defendant obtained as a result of the offenses charged in Count One through Count Three.

4.     If any of the property described above, as a result of any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty,

11

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).

Respectfully Submitted,

GREGORY W. KEHOE
United States Attorney

By: _____
Christopher Poor
Assistant United States Attorney

By: _____
Chauncey A. Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division

12